## A11A0720. HODGES v. THE STATE.

(714 SE2d 717)

BARNES, Presiding Judge.

A jury convicted Mario Hodges of misdemeanor involuntary manslaughter as a lesser included offense of felony murder, aggravated assault, and possession of a firearm during the assault.[1] Following the denial of his motion for new trial, Hodges appeals, arguing that the trial court erred by excluding evidence regarding Hodges' state of mind when he shot the victim. Because the exclusion of this evidence was harmful error, we reverse.

We view the evidence in the light most favorable to the verdict. *Early v. State*, 170 Ga. App. 158, 164 (6) (316 SE2d 527) (1984). So viewed, the evidence showed that Hodges called 911, reported his location, and said he had shot a man named Rudy Turner while defending himself. Police officers were dispatched to the scene and the first officer on the scene found Hodges standing outside of his house holding a shotgun. Hodges put the gun down as directed and was placed in the back of a patrol car. Two officers went into the house and found Turner upstairs, deceased from a shotgun blast. A knife was located about six feet from Turner's body.

The police took Hodges to be interviewed at the Crimes Against Persons Unit, and after Hodges waived his *Miranda* rights, two detectives took his statement. Hodges said the incident began when Turner threatened Hodges and Hodges' daughter, and explained that he had been friends with Turner for about five years. Turner was in and out of jail and had lived with Hodges previously, but Hodges had kicked him out. Seven months before, Turner had come to Hodges' previous apartment demanding money and the two men had gotten into a fistfight, but apparently had "patched up" their relationship after that. Turner had been staying with mutual friends when he called and asked Hodges to come pick him up because he and the friends had "gotten into a disagreement." Hodges did so and Turner slept at Hodges' home that night. The next day, Turner told Hodges that he wanted to collect money from various people who were in his debt, including Hodges, and became angrier as the day went on. Turner demanded that Hodges pawn a television to repay the debt Hodges owed him, then told Hodges that he was "going to get" the people who owed him money and if they failed to pay, he would "go after their relatives or the people they love."

Hodges had a collection of weapons in his upstairs home office.

---

[1] The jury found Hodges not guilty of malice murder, a second count of aggravated assault and a related weapons charge, and the trial court granted a directed verdict on a drug possession and two additional weapons charges.

Turner retrieved a "ball and chain" — a flail with spiked metal balls attached to it — from Hodges' office and brought it downstairs, saying he could use it to go after the people who owed him money. Hodges told Turner to put the weapon away, and Turner went upstairs again. He came back downstairs with a machete and made similar comments of a threatening nature. At that point, Hodges told Turner to pack up his belongings and leave the residence.

After Turner went upstairs with the machete, Hodges retrieved a loaded pump-action shotgun and placed it near his seat in the living room. When Turner came downstairs a third time he was armed with a large Arabian knife, and Hodges testified that Turner "just snapped," went "berserk," and approached Hodges, who said he thought Turner meant to harm him with the weapon. Hodges shot Turner, who turned and ran up the stairs. Hodges testified that he did not think he hit Turner because if he had Turner would not have been able to run away. Hodges testified that he did not know what weapons Turner had, as "he [was] known to carry guns." He followed Turner upstairs and shot at him a second time. Hodges testified he thought this second shot hit Turner because he fell then, and when Turner "made a move" on the floor Hodges hit him with the gun, which discharged a third time. Evidence at trial established that Hodges actually hit Turner with his first shot, which was the fatal strike, and missed him with the second and third shots.

The murder charges against Hodges were based on the first shot Hodges fired at Turner, and the two aggravated assault charges were based on the first and second shots that Hodges fired. At trial, Hodges presented a justification defense pursuant to OCGA § 16-3-21. The jury found Hodges guilty of misdemeanor involuntary manslaughter, aggravated assault based upon the second shot, and possession of a firearm during the commission of that aggravated assault.

Before trial, Hodges sought permission to introduce evidence that Turner had acted violently toward other people on several occasions, all of which Hodges had heard about before he killed Turner. Two of the three incidents involved Turner's violent acts against the friends with whom he had been living before Hodges picked him up the evening before the shooting, and one of the incidents precipitated Turner's departure from the friend's house.

As to the third incident, Hodges also sought to testify that after his fight with Turner seven months before Turner died, a friend told him that Turner had shot at the friend and her daughter. Hodges argued that he should be allowed to explain his state of mind and fear for his personal safety based on his knowledge or belief that Turner committed this shooting, but the court held that Hodges' state of mind testimony was inadmissible because Hodges did not present

independent evidence that Turner had shot at the friend and her daughter.

1. On appeal, Hodges enumerates the refusal of the trial court to permit him to testify about this third act as error, contending that testimony that he believed Turner had shot at two people helped establish his state of mind when he shot Turner.

Hodges' entire defense was justification. He wanted to testify that he shot the victim because he was afraid of him. One reason he was afraid was because, in addition to knowing about the victim's other acts of violence, he thought the victim had shot at a woman and her daughter less than a year before. That belief, combined with the victim's erratic behavior, explained Hodges' state of mind. Hodges' testimony in this regard was not hearsay, as it was not offered to prove that the victim shot these other people but to explain his conduct. It was original, admissible, competent evidence of his state of mind which went to the heart of the matter being tried.

Black's Law Dictionary (5th Ed. 1979) defines "hearsay evidence" as "testimony in court of a statement made out of the court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." OCGA § 24-3-2 defines what is not hearsay: "When, in a legal investigation, information, conversations, letters and replies, and similar evidence are facts to explain conduct and ascertain motives, they shall be admitted in evidence not as hearsay but as original evidence. This statute is applicable when "the conduct and motives of the actor are matters concerning which the truth must be found (i.e., are relevant to the issues on trial). . . ." *Momon v. State*, 249 Ga. 865, 867 (294 SE2d 482) (1982). Hodges' conduct and motives were not just relevant to the issues being tried; they were the only issues being tried, as Hodges admitted he shot the victim. Hodges did not offer the excluded testimony to prove that the victim shot at a woman and her daughter; he offered it to explain why he responded to the victim's show of force the way he did.

In *Chandler v. State*, 261 Ga. 402, 407 (3) (b) (405 SE2d 669) (1991), our Supreme Court for the first time held that a defendant who claimed justification could present evidence of prior acts of violence by a victim against third persons. In doing so, the court did not specifically address the evidence in light of establishing the defendant's state of mind, but found persuasive Justice Weltner's special concurrence in *Lolley v. State*, 259 Ga. 605, 607-610 (385 SE2d 285) (1989). In *Lolley*, Justice Weltner noted the general soundness, in a vacuum, of the principle that a homicide victim's reputation for violence is irrelevant in a murder trial "because it is just as unlawful to murder a violent person as it is to murder a

nonviolent person." Id. at 608 (3) (a). But he then reasoned that, "[i]n differing circumstances, . . . evidence of the violent nature of a victim can be critically important to the discovery of truth," and gave the following example of such a circumstance:

> The town ruffian, in a drunken and enraged state, advances upon a peaceable householder and threatens him with mayhem. The householder shoots him dead, even though no other weapon was in sight, and the erstwhile assailant was several yards distant from the householder. Where the defense is justification under OCGA § 16-3-21, what a defendant "reasonably believes" may be viewed by the factfinder in the light of what the defendant knew as to the decedent's character for violence. Logically, that knowledge is relevant, whether it was obtained by the defendant's painful personal experience at the hands of the decedent; by his observation of violent acts committed by the decedent upon another; *by hearing of other specific acts of violence by decedent that were not committed in his presence*; or by knowledge of the decedent's reputation for violence, unconnected to any specific act.

(Emphasis supplied.) Id. at 608-609. Thus, for example, evidence of a death threat against the defendant was not hearsay when it was offered to explain the defendant's reason for purchasing a gun. *Strickland v. State*, 257 Ga. 230, 232 (2) (357 SE2d 85) (1987); accord *Woods v. State*, 269 Ga. 60, 63-64 (5) (495 SE2d 282) (1998) (evidence of victim's reputation for violence may show that accused acted in reasonable fear). See also *Sturkey v. State*, 271 Ga. 572, 573 (2) (522 SE2d 463) (1999) (evidence victim threatened defendant was not hearsay because it was not offered to prove the truth of statement, but to show victim's threatening attitude).

Cases addressing the procedures and evidence required to establish the *victim's* state of mind or character or prior acts or propensity toward violence do not answer the questions in this case, as they do not address the evidence in terms of establishing the defendant's state of mind.[2] There is a difference between evidence offered to prove a *victim's* state of mind, prior acts of violence, or reputation for violence and evidence offered to prove the *defendant's* state of mind, a difference that is not clearly explained in our State's case law,

---

[2] E.g., *Owens v. State*, 270 Ga. 199, 201 (2) (509 SE2d 905) (1998); *Laster v. State*, 268 Ga. 172, 173-174 (2) (486 SE2d 153) (1997); *Jones v. State*, 265 Ga. 138, 141 (4) (454 SE2d 482) (1995); *Grano v. State*, 265 Ga. 346 (3) (455 SE2d 582) (1995).

leaving the trial court's task in ruling on these issues a difficult one.[3]

Hodges claimed he shot the victim because he was defending himself. Under our law, Hodges was justified in using force against the victim that was likely to cause death or great bodily harm if he *reasonably believed* such force was necessary to defend himself against death or great bodily injury. OCGA § 16-3-21 (a). If he was only justified in using deadly force if he "reasonably believed" he had to defend himself against deadly force, he must be permitted to introduce original evidence explaining the basis for his reasonable belief. In response, the State could have fully explored the veracity of Hodges' testimony about his state of mind through rigorous cross-examination, as it does with any other original evidence introduced by a defendant. If the defendant cannot testify about his state of mind during the incident that resulted in criminal charges against him, then our courts should explain why this exclusion comports with a defendant's constitutional right to testify and present evidence on his own behalf.

As quoted by Justice Weltner in *Lolley*, Chief Justice Lumpkin wrote: "This Court stands pledged by its past history, for the abolition, to the extent of its power, of all exclusionary rules, which shut out facts from the Jury which may serve, directly or remotely, to reflect light upon the transaction upon which they are called upon to pass." *Haynes v. State*, 17 Ga. 465, 484 (1855). The evidence excluded from this case was not hearsay, but original evidence which the defendant should have been allowed to introduce to explain his state of mind. Thus, the trial court erred in excluding it.

2. Further, the exclusion of this line of inquiry cannot be considered harmless. It would have explained his testimony, for example, that Turner "was known to carry guns," which is not otherwise supported by any evidence in the record. A crucial element of Hodges' defense was that his actions were justified, based on his reasonable state of mind. "[T]he test for harmless error is whether it is 'highly improbable' that the jury's verdict would have been different if the excluded evidence had been admitted. Under these

---

[3] E.g., in *Render v. State*, 288 Ga. 420, 423 (2) (a) (704 SE2d 767) (2011), the defendant conceded the inadmissibility of evidence about the victim's specific bad acts under *Chandler*, but argued that the evidence was otherwise admissible to show his state of mind when he shot the victim. Instead of addressing that issue directly, the court held, "[A]s for the jury being informed of Render's allegedly fearful state of mind with regard to [the victim], Render's attorney was able to elicit testimony from Render on the stand about his belief that the victim was dangerous." The court in *Hill v. State*, 272 Ga. 805, 807 (3) (537 SE2d 75) (2000), similarly did not address directly the defendant's "state of mind argument," holding that "[t]o the extent that Hill's complaint is that he should have been permitted to testify to [the victim's] reputation for violence," the testimony was inadmissible because there was no evidence the victim was the aggressor.

facts, it cannot be said that such a result would be 'highly improbable.' '' (Citation omitted.) *Scott v. State*, 281 Ga. 373, 377 (3) (637 SE2d 652) (2006). Accordingly, we reverse Hodges' convictions of involuntary manslaughter, aggravated assault, and possession of a firearm during the commission of a crime.

3. Hodges' remaining enumerations of error are moot.

*Judgment reversed. Miller, P. J., Phipps, P. J., and Adams, J., concur. Ellington, C. J., and Blackwell, J., dissent. Doyle, J., dissents without opinion.*

BLACKWELL, Judge, dissenting.

The majority announces a new rule today: when a defendant claims that his killing of another was justified, he can testify about an instance in which, he says he believed, his victim had done violence to others as evidence of what the defendant was thinking when he killed the victim, notwithstanding that no competent evidence shows that the victim actually did the things that the defendant testifies about. Although this rule has some logical appeal, existing precedent of our Supreme Court rejects it, and we, therefore, should reject it too. Because the majority does not, I respectfully dissent.

The opinion of the majority conflicts with the decision of our Supreme Court in *Hill v. State*, 272 Ga. 805 (537 SE2d 75) (2000). In *Hill*, the defendant shot and killed a man who, the defendant said, appeared to be reaching for a gun. The defendant claimed justification based on self-defense, and in connection with this claim, the defendant sought leave to testify about prior acts of violence by the victim against third persons, arguing that this testimony was relevant to his state of mind at the time he killed the victim. Id. at 807 (3). The trial court disallowed this testimony, and the defendant argued on appeal that the trial court erred when it did so. The Supreme Court held, however, that the defendant's "hearsay testimony was not competent to establish evidence of [the victim's] prior violent acts," and the exclusion of such testimony, therefore, was not error. Id.

The majority pays little attention to *Hill*, notwithstanding that it is the principal precedent on which the State relies, and I think the cursory discussion of *Hill* in the majority opinion makes clear that the majority misunderstands it. The majority correctly observes that cases "addressing the procedures and evidence required to establish the *victim's* state of mind or character or prior acts or propensity toward violence" — as opposed to those cases involving evidence offered to show the *defendant's* state of mind — "do not answer the questions in this case." But, then, in a footnote, the majority misidentifies *Hill* as such a case. *Hill*, the majority says, "did not

address directly the defendant's 'state of mind argument.' " But that is precisely the argument that the Supreme Court said it was addressing in *Hill*: "Hill argues that the trial court erred in refusing to allow him to testify concerning [the victim]'s prior violent acts against third parties, maintaining that his testimony was relevant to his state of mind at the time of the shooting." Id. at 807 (3). A decision of our Supreme Court deserves more careful consideration than the majority gives *Hill*.

To my knowledge, the Supreme Court has never overruled or disavowed its decision in *Hill*,[4] and "we are constitutionally bound by the decisions of our own Supreme Court." *Williamson v. Ward*, 192 Ga. App. 857, 858 (1) (386 SE2d 727) (1989); see also *State v. Smith*, 308 Ga. App. 345, 352 (1), n. 21 (707 SE2d 560) (2011). Perhaps *Hill* is unsound, but that is for the Supreme Court, not this Court, to decide. *Hill* involved testimony offered by the defendant for the same purpose as the testimony that Hodges offered in this case. Because *Hill* is not distinguishable from this case, this Court is bound to reject the claim that the court below abused its discretion when it refused to permit Hodges to testify that he had been informed that his victim had shot at two other people.

The refusal of the majority to decide this case consistent with *Hill* has the potential, of course, to cause confusion in the law.[5] A trial judge faced with a similar issue will wonder whether she should follow this decision or the decision of the Supreme Court in *Hill*. Perhaps our Supreme Court will grant review in this case and resolve the uncertainty the majority has created. If it does not, a trial judge can find the right answer to her question in our Constitution: "The decisions of the Court of Appeals *insofar as not in conflict with those of the Supreme Court* shall bind all courts except the Supreme Court as precedents." Ga. Const., Art. VI, Sec. V, Par. III (emphasis supplied). Because we ought not, however, create this uncertainty in the first place, I respectfully dissent.

I am authorized to state that Chief Judge Ellington joins in this dissent.

---

[4] The Supreme Court recently had an opportunity to disapprove *Hill*, but it did not do so. See *Render v. State*, 288 Ga. 420 (704 SE2d 767) (2011).

[5] Another implication of today's decision is that defendants now can put prior bad acts of the victim before the jury without satisfying the procedural protections imposed by *Chandler v. State*, 261 Ga. 402 (405 SE2d 669) (1991), and its progeny, including notice to the prosecution. See, e.g., *Render*, 288 Ga. at 422 (2) (a); *Owens v. State*, 270 Ga. 199, 202 (2) (509 SE2d 905) (1998); *Laster v. State*, 268 Ga. 172, 174 (2) (486 SE2d 153) (1997). Whether we should permit trial of the victim by ambush is something we should leave to the Supreme Court.

DECIDED JULY 14, 2011 — 

*Lee W. Fitzpatrick*, for appellant.

*Patrick H. Head, District Attorney, Jason R. Samuels, Anna G. Cross, Assistant District Attorneys*, for appellee.